**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BARBARA BROWN, derivatively on behalf of ANADARKO PETROLEUM CORP., | § § § § | |
| Plaintiff, | § § | Civil Action No. 4:17-cv-3160 |
| vs. | § § § | |
| ANTHONY R. CHASE, DAVID CONSTABLE, PAULETT EBERHART, CLAIRE FARLEY, PETER J. FLUOR, JOSEPH W. GORDER, JOHN R. GORDON, SEAN GOURLEY, ROBERT G. GWIN, DARRELL E. HOLLEK, MARK MCKINLEY, ERIC D. MULLINS, ROBERT K. REEVES, and R.A. WALKER | § § § § § § § § § § | DEMAND FOR JURY TRIAL |
| Defendants, | § § | |
| and | § § | |
| ANADARKO PETROLEUM CORP., | § § § | |
| Nominal Defendant. | § | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Barbara Brown ("Plaintiff"), by her undersigned attorneys, derivatively and on

behalf of Nominal Defendant Anadarko Petroleum Corp. ("Anadarko" or the "Company"), files

this Verified Shareholder Derivative Complaint against Individual Defendants Anthony R. Chase,

David Constable, Paulett Eberhart, Claire Farley, Peter J. Fluor, Joseph W. Gorder, John R.

Gordon, Sean Gourley, Robert G. Gwin, Darrell E. Hollek, Mark McKinley, Eric D. Mullins,

Robert K. Reeves, and R.A. Walker (collectively, the "Individual Defendants," and together with

Anadarko, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of

Anadarko, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for her complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Anadarko, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Anadarko's directors and officers beginning in April 2014 through the present (the "General Relevant Period").

2.      Anadarko was founded in 1959 and is a company that performs exploration and development of oil and gas resources, as well as production and marketing thereof. Its business is segmented into three areas of operation: Exploration and Production, Midstream, and Marketing.

3.      As a matter of background, Anadarko was assessed more than $9 billion in environmental fines and settlement payments between 2011 and 2014, and in 2011-2013, the Company incurred a $1 billion loss. But for these losses, the Company would have earned $8 billion during that same period. As a result, the Company's safety and environmental compliance was highly material to the investing public.

4.      As to wrongdoing alleged herein, in 2013 Anadarko obtained over a thousand wells in a Colorado land swap with Noble Energy, Inc., one if its competitors (the "Land Swap"). Shortly after acquiring these properties, the Company discovered that many of the wells had deteriorated with age and posed safety and environmental hazards.

5.      Despite initially allocating tens of millions of dollars to remediate these wells, the Company slashed its remediation budget after the price of oil fell in 2014.

6.      Senior Anadarko executives in Colorado were aware of these safety issues, and participated in meetings regarding whether they could be ignored in favor of focusing on extraction activities.

7.      The Company reduced its workforce by as much as 30% as a result of the decline in oil prices, leaving insufficient staff to safely conduct drilling operations.

8.      Moreover, Anadarko focused its compliance efforts on easy to spot violations, ignoring laws and regulations that were either difficult or uncommon for regulators to enforce.

9.      During the period of time beginning on February 8, 2016 through June 30, 2017 (the "False Statements Relevant Period"), and in breach of their fiduciary duties, the Individual Defendants caused the Company to issue materially false and misleading statements with respect to the Company's operational and compliance procedures, specifically with respect to maintenance and safety protocols in certain vertical wells and flowlines.[1] The Company's failure to maintain and follow adequate safety protocols increased the chance of explosion at some of its vertical wells, thereby rendering public statements of the Company materially false and misleading during the False Statements Relevant Period.

---

[1] Vertical wells travel directly downward though the earth's surface, allowing access to resources directly below the access point.

Verified Shareholder Derivative Complaint

10.     Indeed, on February 17, 2016, Anadarko filed an annual report for the year ended December 31, 2015 on Form 10-K with the SEC, in which it misrepresented that "[t]he Company believes that it is in material compliance with existing environmental and occupational health and safety regulations."

11.     On April 17, 2017, two individuals were killed and a third critically injured in an explosion that took place in a Firestone, Colorado home located within 200 feet of a Company well (the "Firestone Explosion").

12.     In response, the Company shut down 3,000 vertical wells in the area according to an April 26, 2017 report by *The Denver Post*, which was published after markets closed.

13.     On this news, the Company's share price dropped $2.84, or 4.73%, the following day, closing at $57.12 on April 27, 2017.

14.     Publicly, Anadarko expressed sympathy for the victims of the Firestone Explosion. Internally, Defendant Walker stated that he was not concerned about the incident which left two people dead and one person critically injured.

15.     An investigation into the Firestone Explosion was conducted by state and local entities, including the Colorado Oil & Gas Conservation Commission (the "Commission"). The Commission announced on May 2, 2017 that the explosion was linked to a severed flowline[2] from an Anadarko well that had been abandoned, but not disconnected or capped on both ends.

16.     Following the announcement of the investigators' conclusions, Anadarko's share price fell $4.33, or 7.7%, closing at $51.95 on May 3, 2017.

---

[2] Flowlines sit above or below ground and serve to transport oil or gas from a well to a processing or storage facility.

Verified Shareholder Derivative Complaint

17.     On May 25, 2017, an oil tank battery owned by Anadarko in Mead, Colorado exploded while contract workers were performing maintenance, killing one man and injuring three others (the "Mead Explosion").

18.     *The Denver Post* reported on July 1, 2017 that the Company had pledged to permanently shut six wells in the neighborhood where the Firestone Explosion occurred, and had plugged or capped over 6,000 lines in Colorado.

19.     Fire investigators announced on August 11, 2017 that the Mead Explosion had been caused by a buildup of "combustible products" from the storage tanks. These substances had gathered in a trench dug by the workers and had been ignited by their equipment.

20.     The Occupational Safety and Health Administration (OSHA) is conducting an investigation of the Mead blast, the results of which have not yet been released as of the time of filing this Complaint.

21.     Moreover, Colorado oil and gas regulators have tasked Anadarko with performing a "root cause" analysis to determine how and why the Mead Explosion occurred.

22.     By the close of trading on August 30, 2017, the price per share of Company stock fell to $40.52.

23.     During the General Relevant Period, the Company: (1) intentionally violated Colorado regulations and laws, including Commission Rule 1103, by failing to appropriately disconnect and cap disused gas lines, and was aware that hundreds of the wells it had acquired in the Land Swap did not comply with Colorado regulations and laws; (2) failed to keep track of the location of its own flowlines; (3) continued to operate wells and flowlines despite knowing they were potentially unsafe; (4) allowed combustible products to escape from its facilities; (5) had a large proportion of facilities and a pipeline infrastructure that was not state of the art as the

Company stated, but in fact were old and decaying; (6) was unaware of where many of its Colorado lines were located, resulting in the Company's Operations Center not being able to provide consistent real-time monitoring or pinpoint issues; (7) was aware that it had insufficient skilled employees to meet its goal of zero incidents; (8) pursued a strategy of allowing spills to occur where costs of clean up were projected to be less than costs of remediation; and (9) thereby, failed to comply with existing environmental and occupational health and safety regulations and to maintain adequate maintenance and safety protocols with respect to certain of its facilities, creating an increased risk of explosion (collectively, the "Health and Safety Misconduct").

24.     In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Health and Safety Misconduct and to fail to maintain adequate internal controls.

25.     Also during the False Statements Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to the investing public that failed to disclose that the Company: (1) engaged in the Health and Safety Misconduct; and (2) had not maintained adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

26.     For example, the Individual Defendants affirmatively misrepresented to the investing public in the Company's February 17, 2016 Form 10-K filed with the SEC that "[t]he Company believes that it is in material compliance with the existing environmental and occupational health and safety regulations," and made additional affirmative misrepresentations in

its various safety reports and fact sheets published on Anadarko's website during the False Statements Relevant Period, outlined in further detail herein.

27.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

28.     Furthermore, during the False Statements Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Over 706,000 shares of the Company's common stock were repurchased between April 2016 and April 2017 for almost $43.8 million. As the Company stock was actually only worth $40.52 per share, the price at which it was trading on August 30, 2017[3], the Company overpaid over $15.3 million in total.

29.     In light of the Individual Defendants' misconduct, which has subjected Anadarko, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Texas (the "Securities Class Action"), the need to undertake internal investigations, to the Company's being the subject of outside investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

---

[3] July 3, 2017 was the first trading day following Anadarko's announcement that it would permanently shutter six wells in the neighborhood where the Firestone Explosion occurred, and that 6,000 lines had been plugged or capped.

Verified Shareholder Derivative Complaint

30.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and the CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationship with each other, and their not being disinterested and/or independent directors, a majority of the Anadarko Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

32.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

33.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

34.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

Verified Shareholder Derivative Complaint

35.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Texas or who has minimum contacts with this District to justify the exercise of jurisdiction over them. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

36.     Venue is proper in this District because Anadarko and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

37.     Plaintiff is a current shareholder of Anadarko common stock. Plaintiff has continuously held Anadarko common stock since before the beginning of the General Relevant Period. Plaintiff is a citizen of Connecticut.

### Nominal Defendant Anadarko

38.     Anadarko is a Delaware corporation with its principal executive offices at 1201 Lake Robbins Drive, The Woodlands, Texas 77380. The Company's registered agent is located at 1209 Orange Street, Wilmington, Delaware 28401. Anadarko's shares trade on the NYSE under the ticker symbol "APC."

### Defendant Walker

39.     Defendant R.A. Walker ("Walker") has served as the Company's President since February 2010, CEO and director since May 2012, and as Chairman of the Board since May 2013. Defendant Walker is also the Chair of the Executive Committee. According to the Company's Schedule 14A filed with the SEC on March 17, 2017 (the "2017 Proxy Statement"), as of March

1, 2017, Defendant Walker beneficially owned about 938,381 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Walker owned about $62 million worth of Anadarko stock.

40.     For the fiscal year ended December 31, 2016, Defendant Walker received $18,650,252 in compensation from the Company. This included, *inter alia*, $1,300,000 in salary, $8,362,171 in stock awards, $2,828,445 in option awards, and $2,670,200 in non-equity incentive plan compensation.

41.     The Company's 2017 Proxy Statement stated the following about Defendant Walker:

> Mr. Walker, 60, was named Chairman of the Board of the Company in May 2013, in addition to the role of Chief Executive Officer and director, both of which he assumed in May 2012, and the role of President, which he assumed in February 2010. He previously served as Chief Operating Officer from March 2009 until his appointment as Chief Executive Officer. He served as Senior Vice President, Finance and Chief Financial Officer from September 2005 until March 2009. Mr. Walker is a director of the Houston Branch of the Dallas Federal Reserve, a Trustee for the Houston Museum of Natural Science, a member of the Business Council (Executive Committee), Business Roundtable, All-American Wildcatters (Chairman 2017 and 2018), and the Board of Directors of the American Petroleum Institute (Executive Committee). He also serves as the Chairman of the Risk Committee at BOK Financial Corporation (NASDAQ: BOKF). In addition to his current public-company directorship [at BOK Financial Corp.], in the past five years Mr. Walker also served on the boards of Temple-Inland, Inc. and CenterPoint Energy, Inc. (NYSE: CNP), as well as Western Gas Equity Holdings, LLC (NYSE: WGP) and Western Gas Holdings, LLC (NYSE: WES), both of which are subsidiaries of Anadarko.

42.     Defendant Walker is a citizen of Texas.

**Defendant Gwin**

43.     Defendant Robert G. Gwin ("Gwin") has served as the Company's Executive Vice President, Finance and CFO since May 2013 and as Senior Vice President, Finance and CFO since March 2009.  According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Gwin beneficially owned about 390,677 shares of the Company's common stock.  Given that he

price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Gwin owned about $25.8 million worth of Anadarko stock.

44.     For the fiscal year ended December 31, 2016, Defendant Gwin received 7,484,039 in compensation from the Company.  This included, *inter alia*, $750,000 in salary, $3,352,460 in stock awards, $1,133,936 in option awards, and $1,125,750 in non-equity incentive plan compensation.

45.     The Company's Form 10-K filed with the SEC on February 17, 2017 stated the following about Defendant Gwin:

> Mr. Gwin was named Executive Vice President, Finance and Chief Financial Officer in May 2013 and previously served as Senior Vice President, Finance and Chief Financial Officer since March 2009 and Senior Vice President since March 2008. He also has served as Chairman of the Board of WGH since October 2009 and as a director since August 2007. Additionally, Mr. Gwin has served as Chairman of the Board of WGEH since September 2012 and served as President of WGH from August 2007 to September 2009 and as Chief Executive Officer of WGH from August 2007 to January 2010. He joined Anadarko in January 2006 as Vice President, Finance and Treasurer and served in that capacity until March 2008. He has served as Chairman of the Board of LyondellBasell Industries N.V. since August 2013 and as a director since May 2011.

46.     Defendant Gwin is a citizen of Texas.

**Defendant Reeves**

47.     Defendant Robert K. Reeves ("Reeves") has served as the Company's Executive Vice President, Law and Chief Administrative Officer since September 2015, and previously served as the Company's Executive Vice President, General Counsel and Chief Administrative Officer since May 2013.  According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Reeves beneficially owned 431,159 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Reeves owned about $28.5 million worth of Anadarko stock.

48.     For the fiscal year ended December 31, 2016, Defendant Reeves received $6,635,811 in compensation from the Company.  This included, *inter alia*, $700,000 in salary, $2,614,161 in stock awards, $884,209 in option awards, and $1,050,700 in non-equity incentive plan compensation.

49.     The Company's Form 10-K filed with the SEC on February 17, 2017 stated the following about Defendant Reeves:

> Mr. Reeves was named Executive Vice President, Law and Chief Administrative Officer in September 2015 and previously served as Executive Vice President, General Counsel and Chief Administrative Officer since May 2013 and as Senior Vice President, General Counsel and Chief Administrative Officer since February 2007. He also served as Chief Compliance Officer from July 2012 to May 2013. He served as Corporate Secretary from February 2007 to August 2008. He previously served as Senior Vice President, Corporate Affairs & Law and Chief Governance Officer since 2004. Prior to joining Anadarko, he served as Executive Vice President, Administration and General Counsel of North Sea New Ventures from 2003 to 2004 and as Executive Vice President, General Counsel and Secretary of Ocean Energy, Inc. and its predecessor companies from 1997 to 2003. He served as a director of Key Energy Services, Inc., a publicly traded oilfield services company, from October 2007 to December 2016 and has served as a director of WGH since August 2007 and as a director of WGEH since September 2012.

50.     Upon information and belief, Defendant Reeves is a citizen of Texas.

**<u>Defendant Hollek</u>**

51.     Defendant Darrell E. Hollek ("Hollek") has served as the Company's Executive Vice President, Operations since August 2016, and previously served as Executive Vice President, U.S. Onshore Exploration and Production since April 2015.

52.     The Company's Form 10-K filed with the SEC on February 17, 2017 stated the following about Defendant Hollek:

> Mr. Hollek was named Executive Vice President, Operations in August 2016. Prior to this position, he served as Executive Vice President, U.S. Onshore Exploration and Production since April 2015; Senior Vice President, Deepwater Americas Operations since May 2013; and Vice President, Operations since May 2007. Mr. Hollek joined Anadarko upon the acquisition of Kerr-McGee Corporation in August 2006. He has held positions of increasing responsibility with Anadarko and

Kerr-McGee Corporation, where he began his career, including management roles in the Gulf of Mexico; U.S. onshore; and Environmental, Health, Safety and Regulatory. Mr. Hollek has served as a director of WGH and WGEH since May 2015.

53.     Upon information and belief, Defendant Hollek is a citizen of Texas.

**Defendant Chase**

54.     Defendant Anthony R. Chase ("Chase") has served as a Company director since February 2014. Defendant Chase is also a member of the Governance and Risk Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Chase beneficially owned about 16,385 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Chase owned about $1.1 million worth of Anadarko stock.

55.     For the fiscal year ended December 31, 2016, Defendant Chase received $361,845 in compensation from the Company. This included $360,045 in stock awards and $1,800 in all other compensation.

56.     The Company's 2017 Proxy Statement stated the following about Defendant Chase:

Mr. Chase, 62, is Chairman, Chief Executive Officer and owner of ChaseSource, L.P., a Houston-based staffing and real estate development firm. He served as an Executive Vice President of Crest Investment Company, a Houston-based private equity firm, from January 2009 until December 2009. Prior to these positions, he served as the Chairman and Chief Executive Officer of ChaseCom, L.P., a global customer relationship management and staffing services company that he founded and owned until its sale in 2007 to AT&T. Mr. Chase's entrepreneurial track record also includes two other successful business ventures, including Chase Radio Partners, which he founded, developed and ultimately sold, and Cricket Wireless, which he co-founded, developed and later sold. Mr. Chase has also been a Professor of Law at the University of Houston since 1991 and has published numerous environmental law and other law review articles during his tenure. Mr. Chase is on the board of directors of the Greater Houston Partnership, and served as its Chairman during 2012. From July 2004 to July 2008, he served as a director of the Federal Reserve Bank of Dallas, and also served as its Deputy Chairman from 2006 until his departure in July 2008. He is also on the board of directors of the Houston Endowment and the Texas Medical Center and serves on the Board of Trustees for St. John's School and KIPP Schools. Mr. Chase holds Bachelor of Arts, Master of

Business Administration and Juris Doctor degrees from Harvard University. In addition to Mr. Chase's current public-company directorship [at Paragon Offshore plc], in the past five years he also served on the boards of Sarepta Therapeutics, Inc. (NASDAQ: SRPT) and Western Gas Holdings, LLC (NYSE: WES), a subsidiary of Anadarko.

57.     Upon information and belief, Defendant Chase is a citizen of Texas.

**Defendant Constable**

58.     Defendant David E. Constable ("Constable") has served as a Company director since July 2016. Defendant Constable is also a member of the Audit Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Constable beneficially owned about 4,610 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Constable owned about $304,352 worth of Anadarko stock.

59.     For the fiscal year ended December 31, 2016, Defendant Constable received $261,819 in compensation from the Company. This included $47,850 in fees earned, $213,076 in stock awards, and $893 in all other compensation.

60.     The Company's 2017 Proxy Statement stated the following about Defendant Constable:

Mr. Constable, 55, has served as an advisor to Sasol Limited (JSE: SOL) (NYSE: SSL) (Sasol), an international integrated energy and chemicals company based in South Africa, since July 2016. Prior to that he served as Sasol's President and Chief Executive Officer from July 2014 through June 2016 and previously served as Chief Executive Officer from July 2011 through July 2014. Prior to Sasol, Mr. Constable spent nearly 30 years at Fluor Corporation (NYSE: FLR) (Fluor) where he lived on several continents and served in various leadership positions, primarily in the oil and gas, refining, chemical, power and mining industries. Prior to moving to Sasol, Mr. Constable served as Group President of Operations for Fluor. He is a member of The Business Council and a past member of the World Economic Forum International Business Council. He is also an advisor at Cerberus Capital Management, one of the world's leading private investment firms. Mr. Constable holds a bachelor's of science degree in civil engineering from the University of Alberta, and graduated from the International Management Program at the Thunderbird School of Global Management, as well as the Advanced Management

Program at the Wharton School at the University of Pennsylvania. In addition to Mr. Constable's current public-company directorships [at ABB Ltd, Rio Tinto Limited, and Rio Tinto plc], in the past five years he also served on the board of Sasol.

61.    Defendant Constable is a citizen of Florida.

**Defendant Eberhart**

62.    Defendant Paulett Eberhart ("Eberhart") has served as a Company director since August 2004, and has served as Lead Director since February 2016. Defendant Eberhart also serves as Chair of the Governance and Risk Committee and member of the Executive Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Eberhart beneficially owned about 40,614 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Eberhart owned about $2.7 million worth of Anadarko stock.

63.    For the fiscal year ended December 31, 2016, Defendant Eberhart received $418,043 in compensation from the Company. This included $416,243 in stock awards, and $1,800 in all other compensation.

64.    The Company's 2017 Proxy Statement stated the following about Defendant Eberhart:

Ms. Eberhart, 63, currently serves as Chairman and Chief Executive Officer of HMS Ventures, a privately held business involved with technology services and the acquisition and management of real estate. From January 2011 through March 2014, she served as the President and Chief Executive Officer of CDI Corp. (NYSE: CDI) (CDI), a provider of engineering and information technology outsourcing and professional staffing services. She served as a consultant to CDI from April 2014 through December 2014. Ms. Eberhart also served as Chairman and Chief Executive Officer of HMS Ventures from January 2009 until January 2011. She served as President and Chief Executive Officer of Invensys Process Systems, Inc. (Invensys), a process automation company, from January 2007 to January 2009. From 1978 to 2004, she was an employee of Electronic Data Systems Corporation (EDS), an information technology and business process outsourcing company, and held roles of increasing responsibility over time, including senior level financial and operating roles. From 2003 until March 2004, Ms. Eberhart was President of

Americas of EDS, and from 2002 to 2003 she served as President of Solutions Consulting at EDS. Ms. Eberhart is a Certified Public Accountant. In addition to Ms. Eberhart's current public-company directorships [at Ciber, Inc., LPL Financial Holdings Inc., and Valero Energy Corporation], in the past five years she also served on the boards of Cameron International Corporation, CDI and Advanced Micro Devices, Inc. (NASDAQ: AMD).

65.     Defendant Eberhart is a citizen of Texas.

**Defendant Farley**

66.     Defendant Claire S. Farley ("Farley") has served as a Company director since February 2017. Defendant Farley is also a member of the Audit Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Farley beneficially owned about 1,018 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Farley owned about $67,208 worth of Anadarko stock.

67.     The Company's 2017 Proxy Statement stated the following about Defendant Farley:

Ms. Farley, 58, serves as Vice Chair of Energy, advising the Energy group for KKR & Co. L.P. (NYSE: KKR) (KKR), a global investment firm that manages investments including private equity, energy, infrastructure, real estate, credit strategies and hedge funds, since February 2017. Prior to that she served as Vice Chairman for KKR's energy and infrastructure business from 2015 through February 2017, as Partner for KKR's energy and infrastructure business from 2012 through 2015 and as Managing Director for KKR's energy and infrastructure business from November 2011 through December 2012. Prior to joining KKR, from September 2010 to October 2011, Ms. Farley co-founded and served as Co-Chief Executive Officer of RPM Energy, LLC, which partnered with KKR to invest in unconventional oil and gas resources. Prior to co-founding RPM Energy, Ms. Farley was a Senior Advisor at Jefferies Randall & Dewey, the global oil and natural gas industry advisory group at Jefferies Group, Inc., from August 2008 to September 2010 and was Co-President of Jefferies Randall & Dewey from February 2005 to July 2008. Prior to that, Ms. Farley served as Chief Executive Officer of Randall & Dewey, an oil and natural gas asset transaction advisory firm, from September 2002 until its acquisition by Jefferies Group, Inc. in February 2005. From January 2001 to May 2002 she served as Chief Executive Officer of Trade-Ranger Inc., a start-up-venture, and as Chief Executive Officer of Intelligent Diagnostics Corporation, also a start-up-venture, from October 1999 to January

2001. Prior to that, Ms. Farley spent 18 years (1981 to 1999) at Texaco, Inc. where her roles included Chief Executive Officer, Hydro Texaco; President, North American Production Division; and President, Worldwide Exploration & New Ventures. In addition to Ms. Farley's current public-company directorships [at LyondellBasell Industries N.V. and Technip FMC plc], in the past five years she also served on the boards of Encana Corporation (TSX: ECA) (NYSE: ECA), FMC Technologies, Inc. and Samson Resources Corporation.

68.     Upon information and belief, Defendant Farley is a citizen of Texas.

**Defendant Fluor**

69.     Defendant Peter J. Fluor ("Fluor") has served as a Company director since August 2007. Defendant Flour is also a member of the Compensation and Benefits Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Fluor beneficially owned about 138,057 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Fluor owned about $9.1 million worth of Anadarko stock.

70.     For the fiscal year ended December 31, 2016, Defendant Fluor received $370,714 in compensation from the Company. This included $368,914 in stock awards and $1,800 in all other compensation.

71.     The Company's 2017 Proxy Statement stated the following about Defendant Fluor:

Mr. Fluor, 69, has been Chairman and Chief Executive Officer of Texas Crude Energy, LLC, a private, independent oil and gas exploration company located in Houston, Texas, since 1990. He has been employed by Texas Crude Energy, LLC since 1972 and took over the responsibilities of President in 1980. Mr. Fluor serves as lead director of Fluor Corporation (NYSE: FLR). In addition to Mr. Fluor's current public-company directorship [at Fluor Corporation], in the past five years he also served on the board of Cameron International Corporation.

72.     Upon information and belief, Defendant Fluor is a citizen of Oklahoma.

**Defendant Gorder**

73.     Defendant Joseph W. Gorder ("Gorder") has served as a Company director since July 2014. Defendant Gorder is also the Chair of the Compensation and Benefits Committee and

a member of the Executive Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Gorder beneficially owned about 13,519 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Gorder owned about $892,524 worth of Anadarko stock.

74.     For the fiscal year ended December 31, 2016, Defendant Gorder received $377,900 in compensation from the Company. This included $376,100 in stock awards and $1,800 in all other compensation.

75.     The Company's 2017 Proxy Statement stated the following about Defendant Gorder:

> Mr. Gorder, 59, is Chairman, President and Chief Executive Officer of Valero Energy Corporation (NYSE: VLO) (Valero), an international manufacturer and marketer of transportation fuels, other petrochemical products and power. He served as President and Chief Operating Officer of Valero from November 2012, until he assumed the role of Chief Executive Officer on May 1, 2014. He assumed the role of Chairman of the Board effective December 31, 2014. Mr. Gorder previously served as Executive Vice President and Chief Commercial Officer beginning in January 2011, and formerly led Valero's European operations from its London office. He previously served as Executive Vice President – Marketing and Supply beginning in December 2005. Prior to that, he held several positions with Valero and Ultramar Diamond Shamrock Corporation with responsibilities for corporate development and marketing. Mr. Gorder is also Chairman and Chief Executive Officer of Valero Energy Partners LP (NYSE: VLP), a midstream logistics master limited partnership formed by Valero in 2013.

76.     Defendant Gorder is a citizen of Texas.

**Defendant Gordon**

77.     Defendant John R. Gordon ("Gordon") has served as a Company director since April 1988. Defendant Gordon is also a member of the Compensation and Benefits Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Gordon beneficially owned about 180,679 shares of the Company's common stock. Given that the price

per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Gordon owned about $11.9 million worth of Anadarko stock.

78.     For the fiscal year ended December 31, 2016, Defendant Gordon received $365,599 in compensation from the Company. This included $113,763 in fees earned, $250,036 in stock awards, and $1,800 in all other compensation.

79.     The Company's 2017 Proxy Statement stated the following about Defendant Gordon:

> Mr. Gordon, 68, is Senior Managing Director of Deltec Asset Management LLC, a registered investment firm located in New York, New York. He was President of Deltec Securities Corporation from 1988 until it was converted into Deltec Asset Management LLC. Prior to joining Deltec Asset Management LLC, Mr. Gordon was a managing director of Kidder, Peabody & Co., where he spent 12 years in the firm's corporate finance department.

80.     Upon information and belief, Defendant Gordon is a citizen of New York.

**Defendant Gourley**

81.     Defendant Sean Gourley ("Gourley") has served as a Company director since September 2015. Defendant Gourley is also a member of the Governance and Risk Committee. According to the Company's 2016 Proxy Statement, as of March 1, 2017 Defendant Gourley beneficially owned about 8,693 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Gourley owned about $573,912 worth of Anadarko stock.

82.     For the fiscal year ended December 31, 2016, Defendant Gourley received $361,836 in compensation from the Company. This included $110,000 in fees earned, $250,036 in stock awards, and $1,800 in all other compensation.

83.     The Company's 2017 Proxy Statement stated the following about Defendant Gourley:

Dr. Gourley, 37, has served as Chief Executive Officer of Primer Technologies, Inc., a company building software to power artificial intelligence applications for the finance and military intelligence industries, since he founded it in February 2015. From March 2009 to January 2015, he was the Chief Technology Officer of Quid, Inc., a San Francisco-based augmented intelligence company he founded which builds software for strategic decision-making. Dr. Gourley studied at The University of Oxford as a Rhodes Scholar where he received a Ph.D. in physics, and he received both his Bachelor of Science and Master of Science in physics from the University of Canterbury in Christchurch, New Zealand. He was additionally a Post-Doctoral Research Fellow at the Said Business School at Oxford University and is currently an Equity Partner with Data Collective Venture Capital Fund, investing in key data and algorithmic technologies.

84.     Defendant Gourley is a citizen of California.

**Defendant McKinley**

85.     Defendant Mark C. McKinley ("McKinley") has served as a Company director since February 2015. Defendant McKinley is also a member of the Audit Committee. According to the Company's 2016 Proxy Statement, as of March 1, 2017 Defendant McKinley beneficially owned about 10,700 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Defendant McKinley owned about $706,414 worth of Anadarko stock.

86.     For the fiscal year ended December 31, 2016, Defendant McKinley received $361,836 in compensation from the Company. This included $110,000 in fees earned, $250,036 in stock awards, and $1,800 in all other compensation.

87.     The Company's 2017 Proxy Statement stated the following about Defendant McKinley:

Mr. McKinley, 60, has served as Managing Partner of MK Resources LLC, a private oil and gas development company specializing in the recovery and production of crude oil and the development of unconventional resource projects, for more than ten years. He is also the founder and President of Labrador Oil Company, a private oil and natural gas exploration and development firm. In addition, Mr. McKinley is the Managing Partner of M Natural Resource Partners, LP, which holds mineral, royalty and real estate interests, both directly and indirectly through various partnerships. Mr. McKinley currently serves on the

Boards of Directors of the Merrymac McKinley Foundation and the Tip of the Spear Foundation.

88.    Upon information and belief, Defendant McKinley is a citizen of Pennsylvania.

**Defendant Mullins**

89.    Defendant Eric D. Mullins ("Mullins") has served as a Company director since May 2012. Defendant Mullins is also Chair of the Audit Committee and a member of the Executive Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Mullins beneficially owned about 20,871 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Mullins owned nearly $1.4 million worth of Anadarko stock.

90.    For the fiscal year ended December 31, 2016, Defendant Mullins received $386,823 in compensation from the Company. This included $385,023 in stock awards, and $1,800 in all other compensation.

91.    The Company's 2017 Proxy Statement stated the following about Defendant Mullins:

> Mr. Mullins, 54, serves as the Managing Director and Co-Chief Executive Officer of Lime Rock Resources, a company that he co-founded in 2005 which acquires, operates and improves lower-risk oil and natural gas properties. From May 2011 through October 2015, he also served as the Co-Chief Executive Officer and Chairman of the Board of Directors of LRE GP, LLC, the general partner of LRR Energy, L.P., an oil and natural-gas company. Prior to co-founding Lime Rock Resources, Mr. Mullins served as a Managing Director in the Investment Banking Division of Goldman Sachs (NYSE: GS) where he led numerous financing, structuring and strategic advisory transactions in the division's Natural Resources Group. In addition to his current public-company directorships [at Pacific Gas and Electric Company and PG&E Corporation], in the past five years he served on the board of LRE GP, LLC.

92.    Upon information and belief, Defendant Mullins is a citizen of Texas.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

93.     By reason of their positions as officers, directors, and/or fiduciaries of Anadarko and because of their ability to control the business and corporate affairs of Anadarko, the Individual Defendants owed Anadarko and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Anadarko in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Anadarko and its shareholders so as to benefit all shareholders equally.

94.     Each director and officer of the Company owes to Anadarko and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

95.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Anadarko, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

96.     To discharge their duties, the officers and directors of Anadarko were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

97.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Anadarko, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Anadarko's Board at all relevant times.

98.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

99.     To discharge their duties, the officers and directors of Anadarko were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Anadarko were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Anadarko's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Anadarko conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Anadarko and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Anadarko's operations would comply with all applicable laws and Anadarko's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

100.   Each of the Individual Defendants further owed to Anadarko and the shareholders the duty of loyalty requiring that each favor Anadarko's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

101.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Anadarko and were at all times acting within the course and scope of such agency.

102.   Because of their advisory, executive, managerial, and directorial positions with Anadarko, each of the Individual Defendants had access to adverse, non-public information about the Company.

103.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Anadarko.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

104.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

105.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b) and 20(a)

Verified Shareholder Derivative Complaint

of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; (iii) to engage in the Health and Safety Misconduct; and (iv) to artificially inflate the Company's stock price while the Company repurchased its own stock.

106.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Anadarko, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

107.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

108.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Anadarko, and was at all times acting within the course and scope of such agency.

## ANADARKO'S CODE OF BUSINESS CONDUCT & ETHICS

109.    Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the Company's employees and directors are expected to "act in a manner consistent with the code" and comply with the law.

110.    The Company's Code of Ethics requires employees to, among other things: "take necessary precautions to prevent accidents or injuries, as well as to report any unsafe practices or conditions." Additionally, if an Anadarko employee or director "become[s] aware of any threat to the safety of a coworker, Anadarko worksite, or the community near [Anadarko] operations [they should] report it immediately."

## ANADARKO'S HEALTH, SAFETY, AND ENVIRONMENT POLICY

111.    Anadarko publishes an annual Health, Safety, Environment and Sustainability Overview, which is available on the Company's website. The 2016 edition outlines the Company's Health, Safety, and Environment ("HSE") Policy, which it summarized as follows:

**Purpose**
To respect and protect the safety and health of the public, our employees, our contractors and the environment in all countries and communities in which we conduct our business.

**Policy**
The policy of Anadarko with respect to the environment, health and safety is to:
> Promote a culture that allows for employee involvement in maintaining a safe work environment while recognizing that safety, health and environmental incidents are preventable
> Strive for zero injuries and incidents
> Be a recognized leader in environmental stewardship
> Promote continuous improvement in our processes, reducing risk to safety, health and the environment
> Adhere to applicable laws, regulations, Anadarko policies and procedures, and recognized standards

Additionally, everyone has the responsibility, and will be held accountable, to work safely and in an environmentally sound manner.

Our number one priority is the safety and well-being of the public, our employees, and contractors
Our business activities will be conducted to minimize our environmental impact

112.    In violation of the Code of Ethics and the Company's HSE Policy, the Individual Defendants conducted little, if any, oversight of the Company's internal controls and of the Company's compliance with its own safety policies and applicable laws, including the safety of its resource extraction and transportation facilities, and facilitated and disguised the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Business Conduct and Ethics and HSE Policy, the Individual Defendants who are members of the Board consciously disregarded their duties of loyalty, ethics, to act in the best interests of the Company, to use their free access to management to obtain all information necessary to fulfill their duties, and to assess their own performance as well as the CEO's.

**BACKGROUND**

113.    Incorporated as a subsidiary of Panhandle Eastern Corporation Pipe Line Company in 1959, Anadarko spun off into an independent entity in 1986.

114.    Anadarko explores for, acquires and develops oil and natural gas resources, operating onshore in the Americas, Africa and New Zealand as well as offshore. The Company had approximately 1.72 billion barrels-equivalent of proved reserves as of December 31, 2016, and sales revenues of $8.4 billion in 2016.

115.    Anadarko acquired Kerr-McGee Corporation in 2006. This acquisition, in addition to the acquisition of Western Gas Partners, LP, resulted in Anadarko holding significant oil and gas interests in the Denver-Julesberg ("DJ") Basin in Colorado. This highly productive area

accounted for 38% of Anadarko's proved onshore oil and gas reserves in the lower 48 states as of the end of 2006.

116.     The Company is divided into three main operating divisions: Upstream, Midstream, and Marketing. Upstream is focused on exploration and capture of oil and gas resources. Midstream conducts transportation, storage, and wholesale marketing of oil and gas resources. Marketing is focused on bringing energy commodities to market.

117.     Anadarko had focused its efforts predominantly in the DJ Basin, Delaware Basin, and the Gulf of Mexico – Deepwater by the end of 2015. These areas were projected to receive 60% of the Company's capital expenditures in 2016. Of $2.6-2.8 billion budgeted, $700 million was allocated to Deepwater resources in the Gulf of Mexico and $1 billion was allocated evenly between the DJ and Delaware Basins.

118.     Anadarko has significant holdings in the Wattenberg field, an oil field in the DJ Basin located to the north of Denver, Colorado. The Wattenberg field has been used for oil production since 1970, but the advent of horizontal drilling has led to increased activity and production in the region. Since the first horizontal well was drilled there in 2009, more drilling activity has been directed at the Wattenberg field than anywhere else in the DJ Basin.

119.     In 2015, the Wattenberg field generated 30.1% of Anadarko's worldwide oil production and 20.7% of its worldwide gas production. In contrast, the field only accounted for 17.6% of oil production and 10.5% of gas production for Anadarko in 2013. By the end of 2015, Anadarko operated approximately 5,000 vertical wells and 1,000 horizontal wells in the area.

120.     Over 20,000 oil and gas wells are located in the Wattenberg field alone.

121.     The field is especially profitable for the Company because of several economic advantages. Anadarko owns significant acreage there, obviating the need to pay lease fees.

Defendant Gwin publicly stated in 2015 that approximately 40% of the Company's operations in the Wattenberg field were located on Anadarko owned acreage. The Company is also able to take advantage of economies of scale as one of the two largest operators in the area alongside Noble Energy. In addition to the high production noted in the previous paragraph, a subsidiary of Anadarko had extensive pipelines and two large processing plants in the area. The result, according to the Form 10-K filed with the SEC for the year ended December 31, 2015, is that Anadarko's production costs in Wattenberg were $7.64/BOE,[4] compared to a worldwide average production cost of $8.31/BOE.

122.    Due to the favorable economics of operating in the Wattenberg field, Anadarko pursued aggressive development starting in 2013, drilling hundreds of horizontal wells per year and operating five horizontal drilling rigs in the DJ Basin, the geographic area in which the Wattenberg field is located, as of November 29, 2016.

123.    Bradley Holly, Anadarko's Vice President of the Rockies Division until his promotion in 2016, noted on August 16, 2016 at the EnercCom Oil & Gas Conference that the breakeven point for Anadarko in the Wattenberg field was $30/barrel. At any lower price, Anadarko would lose money in the Wattenberg field.

124.    Over a quarter of Anadarko's employees were in Colorado as of 2015, taking advantage of what Defendant Gwin described as the "phenomenal" economics of the DJ Basin. Defendant Gwin noted in 2015 that the cost of drilling a horizontal well in Wattenberg was as low as $3.5 million, and that Anadarko's onshore activity would "primarily" focus on the Wattenberg field due to the favorable returns. In 2016, Defendant Gwin characterized the area as "just about

---

[4] BOE stands for barrel of oil equivalent, and is used to compare natural gas an oil reserves in an "apples to apples" fashion. The measure is based on the approximate amount of energy released by burning a barrel of crude oil. Six thousand cubic feet of natural gas constitutes 1 BOE.

the best unconventional asset in the world" that "competes economically with anything that's out there." In the same year, he stated that the DJ Basin "is, I think, maybe arguably, but in our opinion, this is the most attractive basin in North America from an economic standpoint for Anadarko. Quite frankly, economically, even better than Delaware."

125.    In November 2016, Defendant Gwin stated that Anadarko intended to add more horizontal drilling rigs in the DJ Basin if oil prices remained steady, beyond the five that were there at the time. Further, he noted that each rig took an average of four days to drill a horizontal well.

126.    The Company consistently touted the sheer size of the Wattenberg field, and Anadarko noted that it had identified 4,000 locations to drill horizontal wells with total reserves of 1.5 billion barrels.

127.    Due in part to the productivity of the field, a large proportion of Anadarko employees were located in Colorado. As of the end of 2015, 1,500 of 5,800 total Anadarko employees, or over a quarter of them, were located in Colorado.

**The Land Swap**

128.    In late 2013, Anadarko and its largest competitor in the Wattenberg field, Noble Energy, announced a large-scale exchange of ownership of land in the Wattenberg field. The Land Swap, which involved approximately 100,000 acres of land, served to consolidate the holdings of each company into more cohesive geographic areas. The Assignment effectuating the Land Swap, dated October 18, 2013, was effective – retroactively -- as of January 1, 2013.

129.    Anadarko's land holdings were consolidated into the South-West area of the DJ Basin, a developed and populated area just North of Denver. On the other hand, Noble's holdings were consolidated into the less-inhabited, North-East portion of the Basin.

130.    Anadarko obtained 1,500 existing wells in the Land Swap. These wells were as much as 50 years old, and had been drilled before the area had developed beyond a pastoral state. At the time of the Land Swap, however, many of Anadarko's new holdings—including the aging wells—were located near homes and schools. One such well was the Firestone well, which had been drilled in 1993.

131.    At the time of the Land Swap, setback requirements did not prevent homes from being built near wells (although they did prevent wells from being built near homes). These setback requirements allowed drilling 500 feet away from buildings, 350 feet from outdoor recreation areas, and 1,000 feet from high occupancy buildings.

132.    Flowlines, which transport oil, gas, and waste from wells were not subject to setback or disclosure requirements. Anadarko did not disclose the location of its oil and gas lines.

133.    In the absence of disclosure, real estate developers risked accidentally severing flowlines when building structures simply due to lack of knowledge. As a result, combustible products could leak into the structure and surrounding areas when wells became active.

134.    The large number of wells involved in the swap precluded either company from inspecting more than a small number, according to FE 1.[5] Recognizing this, both Anadarko and Noble contributed funds to an escrow account to deal with any safety or environmental problems

---

[5] Anonymous witnesses are identified herein with the designation "FE 1," "FE 2," etc. when referencing former employees and "CE 1" when referencing a contractor employee. All such or otherwise references to anonymous witnesses or employees are drawn from the Amended Class Action Complaint For Violations of the Securities Laws filed in the Securities Class Action on October 13, 2017, which is attached as Exhibit A hereto, and correspond to the same referenced witnesses as contained therein.  FE 1 served as the Company's Regional Director of Government Relations for the Rockies Region since August 2007, before being promoted to Director of Engagement and Strategy for the Rockies Region in March 2015.  He left the Company in November 2016.  FE 1 managed the Company's public affairs group and managed all social investment, government relations, and stakeholder relations teams.  He also reported to Brad Holly, the Company's vice President of the Rockies Division until August 2016, and attended regular leadership team meetings headed by Brad Holly.  The regular leadership team meetings were also attended by the Company's General Manager for the Wattenberg Asset, General Manager for the Utah Asset, General Manager for the Wyoming Asset, General Manager for Drilling Operations, General Manager for Field Operations, General Manager for Completion, and Anadarko's Director of Environment, Health & Safety, U.S. Onshore E&P, Korby Bracken.

arising from the wells. Any problems revealed by post-closing inspections would be resolved using the money in the escrow account.

135.    In part due to the age of the wells received by Anadarko, FE 1 reported that the wells the Company received in the exchange had problems far greater than what Anadarko had projected. The wells, most of which were over 30 years old, were not in compliance with Colorado's safety and emission rules, which had become more stringent in the intervening decades. Many lacked even the most basic methane emissions controls, which had become a requirement since they had been drilled. While modern wells capture emitted gas through pressurization, returning it to the system, these wells vented methane—a highly combustible greenhouse gas— directly into the atmosphere.

136.    Further, these wells were operating with the original piping and storage tanks, which were over 30 years old. These components, as well as the cellars and cement pits designed to prevent any liquids from seeping into the ground or groundwater, had deteriorated with time.

### The Economic Winds Shift

137.    In the latter half of 2014, the price of oil suffered a precipitous drop, losing nearly half its value over a several-month period. West Texas Intermediate, which traded on the New York Mercantile Exchange at $95.83/barrel on September 1, 2014, plummeted to $54.56/barrel by January 1, 2015. As of mid-October 2017, the price remains at around $50/barrel.

138.    This price drop has resulted in net losses in the billions for 2014, 2015 and 2016 for Anadarko (nearly $1.6 billion, over $6.8 billion and over $2.8 billion, respectively).[6] Prior to the collapse of oil prices, Anadarko posted strong profits in 2012 and 2013 (with a net income of

---

[6] These losses were due in part to significant fines and penalties paid as a result of environmental liabilities stemming from, *inter alia*, the Deepwater Horizon explosion and the Tronox settlement—the largest environmental contamination settlement in U.S. history at $5.15 billion.

$2.4 billion and $941 million, respectively). The profit in year 2013 came despite an $850 million contingent loss related to settlement of environmental liabilities related to Tronox Inc.

139.    Similarly, revenues dropped from a recent high of approximately $18.5 billion in 2014 to approximately $8.7 billion and $7.9 billion in 2015 and 2016, respectively

140.    As previously noted, environmental liabilities have plagued Anadarko's balance sheet for years. As another example, the Company suffered a net loss of nearly $2.6 billion in 2011, due in part to liabilities incurred as part of the Deepwater Horizon explosion.

141.    According to FE 1, this drop in price cut the Company's margins, and caused safety decisions to be made at higher levels of management. FE 4[7] stated that when oil prices fell, the Company's attitude toward safety changed completely. The Company's safety, remediation, and community relations budgets were slashed.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### The Health and Safety Misconduct

142.    The Individual Defendants engaged in and/or caused the Company to engage in the Health and Safety Misconduct. The Health and Safety Misconduct resulted in the loss of life and injury to several persons, as well as a decline in the value of the Company, and, correspondingly, shareholder value.

### FE 1's Representations

---

[7] Between September 2014 and March 2016, FE 4 served as a Senior International Health, Safety & Environment Representative for the Company, and worked out of the Woodlands.  FE 4's responsibilities included auditing the Company's contractors to ensure they were up to date with regulations, such as OSHA regulations.  FE 4 reported to Phillis Schlagel, the Company's Director of health, Safety & Environment Services, Jeff Ostmeyer, the Company's Environment, health & Safety Inspector, and Greg Hamilton, the Company's Health, Safety & Environment Audit Manager, who all reported to the Company's officer position of Vice President, Global Health, Safety & Environment, David McBride.

143.    Safety and maintenance issues with the acquired wells were well understood by top management—including the Executive Committee—by April of 2014 at the latest, and such problems were discussed frequently.

144.    An excel spreadsheet listing up to several hundred risky and problematic wells was compiled by the Company's Colorado Health, Safety & Environment staff. FE 1 attended regular presentations of the continuously-updated list given to Anadarko's senior leadership team for Colorado.

145.    In 60% of Anadarko's land in Wattenberg where the Company held leases, lease terms commonly required that the Company actually operate the wells in order to maintain its lease. Loss of the lease would require Anadarko to renegotiate with the owners of the mineral rights. Due to the increased interest in the Wattenberg field over the last few years and the fact these leases were signed decades earlier, renegotiation would result in significantly less advantageous terms for Anadarko.

146.    As a result, maintaining these older leases was of great concern to the Company. In order to retain their lease rights, the Company was forced to operate many of the wells received in the Land Swap, without regard for the condition of any given well.

147.    A budget in the low tens of millions of dollars was authorized by the Executive Committee to remediate wells acquired in the Land Swap that were deemed to be a risk to safety or the environment. At the time of the budget authorization, Anadarko was actually prepared to spend the money.

148.    Company budgets were crafted based on oil price estimates. At $100/barrel, remediation was well-funded. However, FE 1 stated that "remediation and repair of old wells was very rarely a significant percentage of the capital allocation in a lower commodity price

environment" such as $40-50/barrel. Following the collapse of oil prices in late 2014, the Company slashed its remediation budget, allocating very little resources to remediating these problem wells.

149.    The Field Operations Division made the final decisions regarding what wells were to be remediated. FE 1 stated "Operations had the veto power, drilling wells was the priority. Operations trumped everything else within the company." Field Operations expended remediation resources primarily on supporting production, and secondarily on avoiding fines. Potential safety risks and a given well's proximity to homes and schools were not factored into decisions regarding which wells to remediate.

150.    As corroborated by FE 2,[8] these issues were exacerbated by a 20-30% company-wide reduction in staff in March 2016. These layoffs affected every division, including 30% of Field Operations personnel and 30% of the Health, Safety & Environment Division.

151.    As of November 2016, when FE 1 left Anadarko, very little remediation work had occurred. However, the Executive Committee received status reports on efforts to remediate the Noble Energy wells.

**Low Staffing and a Focus on Extraction Leads to Predictable Results**

152.    Colorado was not exempt from the reduction in staff. Anadarko employed 1,500 in the state at the beginning of 2016, a number which shrank to 1,100 by November and 1,000 by the middle of 2017.

153.    According to FE 2 and FE 6,[9] Anadarko increased extraction activities in Colorado during late 2016 and early 2017, expanding its number of drilling rigs in the state from one to five.

---

[8] From July 2012 to March 2017, FE 2 served as the Company's Government and Public Affairs Manager.  FE 2 reported to FE 1 until FE 1's promotion, when she then reported to the Company's Vice President of Corporate Communications, John Christiansen.  It was FE 2's responsibility to handle crisis communications, including media relations whenever the Company was involved in any safety or hazard controversies.  These controversies included injuries, oil spills, and fires, with FE 2 stating that there were "a lot of them."
[9] FE 6 served as a contract Environmental Specialist for the Company from July 2015 to September 2016, working in Weld County, Colorado.

As a result, there were fewer Anadarko employees operating in the state and responsible for more extraction activity than before.

154.    Further, the safety and remediation teams were vastly understaffed, leaving them short on both labor and skill according to FE 2. That person indicated that checking the safety of all Company flowlines in the Wattenberg field in Weld County was done by a single person—a job that would require twelve to twenty people to do properly.

155.    FE 6, a contract Environmental Specialist, stated that "[i]n my industry, not a lot of people like to work for them. It's a money thing, mostly. They're tough to work for, as far as environmental consultants. They were a little stingy with that."

156.    Inadequate staffing issues were brought to the attention of John Christiansen, Vice President of Corporate Communications[10] ("Christiansen") approximately twelve times by FE 2 between late 2016 and March 2017. FE 2 also raised these concerns with engineer Shane Fross and Paul Schneider, Health Safety & Environment Manager for the DJ Basin. FE 2 quit her position due to disgust with the Company's practices.

157.    CE 1[11] indicated that even prior to the beginning of the layoffs in March 2016, the Company had only two Health, Safety & Environment Inspectors in the Permian Basin, which contains 400-500 wells. This employee indicated that "there was no way they could do it."

158.    FE 4 characterized Anadarko's commitment to safety as "lip service." That person discovered that many Company contractors lacked proper training to do the work and did not comply with safety regulations, including those promulgated by OSHA. Upon uncovering this issue, he sent a formal email to the contractors, copying who he characterized as "everyone and

---

[10] Christiansen has served in this position since October 2015. As the overall head of Anadarko's external communications, Christiansen works in The Woodlands.
[11] CE 1 served as a Safety Inspector for Gulf Interstate Engineering Co., a third-party that had contracts for all of the Company's wells in the Permian Basin, and worked exclusively on the Company's wells from 2014 through 2015.

their brother," including Jeff Ostmeyer, Anadarko's Environment, Health & Safety Inspector, Phillis Schlagel, Anadarko's Director of Health, Safety & Environment Services, and Greg Hamilton, Anadarko's Health, Safety & Environment audit manager. No one ever responded, and Anadarko continued to utilize these contractors.

159.    Although in-house the Company acknowledged that staff reductions were causing safety incidents, it did not do so externally. At an internal meeting attended by Shane Fross, Paul Schneider, Craig Walters, FE 2, and others, held to prepare for a Commission hearing following a 28,000 gallon oil spill in Weld County, Colorado, Company officials stated that the cause of the accident was a lack of skilled staff. However, Shane Fross stated "[d]ont's say that during the Commission hearing." The Company proceeded to conceal the fact that inadequate staffing caused the spill at the Commission hearing.

160.    Prior to the spill, oil had become stuck in a pipe at the same facility. During meetings at which FE 2 was present, the Company opted to engage in a "quick fix" that posed a 50-60% chance of the well exploding instead of filling in the well and drilling another. This fact was not disclosed to the Commission.

161.    Following the oil spill, FE 2 raised her concerns that the lack of skilled staff was creating safety risks. John Christiansen responded that she should "keep quiet" because her job "was to shovel shit, and to clean up the messes that [Anadarko's employees] make." FE 2 proceeded to warn John Christiansen that large problems were on the horizon in Colorado if the Company continued to neglect Health, Safety & Environment.

162.    What little Anadarko was spending on remediation was allocated to high-producing wells and those whose poor condition or regulatory violations posed problems for the Company's drilling schedule. For example, Anadarko would check nearby lease-maintaining assets when

drilling new horizontal wells. The older wells would be stress-tested, and if they could not handle the pressure of the new well, they would be plugged and abandoned. Thus, the remediation budget was essentially co-opted to support production.

163.    Methane emissions would subject the Company to federal and state regulatory fines, which were calculated by tons of methane emitted and could be as high as hundreds of thousands of dollars. Anadarko was aware that regulatory inspectors utilized infrared cameras to observe emissions emanating from older wells. Due to the ease of detection and high potential liability, Anadarko remediated those wells that emitted a lot of methane.

164.    FE 1 stated that remediation of wells "had nothing to do with the probability of the wells, or flowlines, creating environmental or safety hazards. The company prioritized either the decommissioning of a well, the upgrade or repair of the well, based on where the drilling schedule was." Further, violations of regulatory standards were not taken into account where such violations were not easy to detect.

165.    Regular leadership team meetings headed by Bradley Holly were attended by FE 1, Anadarko's General Manager for the Wattenberg Asset, General Manager for the Wyoming Asset, General Manager for the Utah Asset, General Manager for Field Operations, General Manager for Drilling Operations, General Manager for Completion, and Korby Bracken, Anadarko's Director of Environment, Health & Safety, U.S. Onshore E&P.

166.    Prioritization of remediation funds was occasionally discussed at these leadership team meetings. Further, the Company's upper executives based in Colorado were aware that these remediation efforts were a problem. Several meetings of senior Colorado staff were convened, which included FE 1, Korby Bracken, Craig Walters, Anadarko's Vice President – DJ Basin from

2013 to May 2017,[12] and several others specifically to discuss how expending remediation funds to support drilling instead of to address health, safety, and environmental hazards could lead to disasters.

167.     Anadarko engaged in a pattern of ignoring employees' safety concerns. In addition to the foregoing, FE 1 stated that Bracken raised health and safety concerns and suggested remediation efforts at regular leadership meetings. These concerns were ignored in favor of addressing timing and location.

**Regulatory Violations**

168.     The Commission is a state regulatory body that has jurisdiction over oil and gas operators engaged in activity in Colorado.

169.     In the exercise of its regulatory function, the Commission has promulgated rules which govern oil and gas operations in the state. The 1100 series of rules regulates pipelines.

170.     Specifically, Rule 1103 – Abandonment, which was in effect during the entire General Relevant Period, requires that "[e]ach pipeline abandoned in place shall be disconnected from all sources and supplies of natural gas and petroleum […] and cut off […] and sealed at the ends." Further, "[n]otice of such abandonment shall be filed with the Commission and with the local governmental designee or local governmental jurisdiction."

171.     As explained further herein, Anadarko violated Rule 1103 thousands of times.

172.     It was impossible for Anadarko to comply with Rule 1103 because the Company did not know the location of many of its own lines. FE 5[13] indicated the Anadarko found lines that did not appear on internal maps "all of the time." He blamed this on several factors, including

---

[12] In May 2017, Walters was promoted to the position of Vice President – Rockies. Walters works in Denver.
[13] FE 5 served as a contract safety inspector for the Company from October 2013 to February 2015, working out of Weld County, Colorado.

Verified Shareholder Derivative Complaint

failure to engage in sufficient due diligence and making use of incomplete information from Noble Energy.

173.    This situation was not unique to Wattenberg. CE 1 indicated that Anadarko was also unaware of the location of many lines located in the Permian Basin. CE 1 considered it so common to "find a line that was not even on the map" that he carried a metal detector when inspecting Anadarko locations. He characterized the situation as "scary."

**The Firestone Explosion**

174.    Anardarko turned on the Firestone Well in January 2017 in order to maintain the company's lease.

175.    FE 1 stated that data from the well "was not lining up." As the Firestone Well was not equipped with a compressor for the disposal of methane, it should have emitted methane when turned on. However, it did not.

176.    Anadarko sent two crews to inspect the well during the first weeks of April 2017. Although neither crew could explain why the well was not emitting methane, the Company did not shut off the well.

177.    Although FE 1 was no longer with the Company at this time, he learned these facts from former colleagues who were still employed at Anadarko at the time.

178.    FE 2 indicated that the staffing shortages meant no one checked the flowlines from the Firestone Well for leaks after it had been turned on. Even if they had checked the recorded lines, they would have missed the leaking line, which was not included in Company records.

179.    Odorless natural gas escaping from a severed flowline leading from the Firestone Well saturated the ground. As a result, a home which was located within 200 feet of the well exploded on April 17, 2016, killing two people—Mark Martinez and Joseph Irwin III—as they attempted to install a water heater. Erin Martinez, Mr. Martinez's wife, was critically injured. The

Martinez's 11-year old son narrowly escaped serious injury by jumping out of his bedroom window. Ms. Martinez remained in the hospital for a month and a half.

180.    Following the explosion, Anadarko voluntarily shut down 3,000 vertical wells in the area, according to an April 26, 2017 report by *The Denver Post*, which was published after markets closed. According to Company estimates, these closures cut production by 13,000 net barrels of oil per day—representing approximately 1.6% of Anadarko's average daily production.

181.    The Company's share price dropped 4.73%, or $2.84, the following day, closing at $57.12.

182.    In the wake of the explosion, the Governor of Colorado issued a state order on May 2, 2017 (the "Notice to Operators") requiring producers to inspect and test all oil and gas lines within 1,000 feet of occupied structures. Abandoned flowlines within the 1,000 foot rule were to be taken out of service pursuant to Rule 1103 by June 20, 2017.

183.    As a result, Anadarko tested 4,000 active oil and gas lines—16 of which failed and had to be repaired.

184.    An investigation was conducted by state and local entities, which concluded that the explosion was linked to a severed 1" flowline from the Firestone Well that had been abandoned but not been disconnected or capped. Failure to disconnect and cap the line is a violation of Rule 1103. The findings were announced on May 2, 2017 after the close of trading.

185.    Following the announcement of the investigators' conclusions, Anadarko's share price fell $4.33, or 7.7%, closing at $51.95 on May 3, 2017.

186.    Anardarko published a statement attributed to Defendant Walker which read: "Our thoughts and prayers remain with the Martinez and Irwin families as they continue to mourn the

loss of their loved ones," adding that "[t]he safety of our employees and the people who live and work in the communities in which we operate is our number one priority."

187.    However, according to FE 2, individuals still with the Company at the time represented that Bradley Holly did not mention the Firestone Explosion at the next Anadarko town hall meeting. Instead, Defendant Walker mentioned the Company was not too concerned about the event. Several Anadarko employees walked out of the meeting in disgust in response to Defendant Walker's statement.

188.    A May 10, 2017 article in *The Denver Post* reported that the National Transportation Safety Board had joined the local investigation into the Firestone Explosion. Further, the article noted that a National Transportation Safety Board spokesman had indicated that it was looking to see whether there were safety issues that could have a national policy impact.

189.    *The International Business Times* reported on May 17, 2017 that Anadarko had successfully lobbied against proposed Colorado legislation that sought to require operators to disclose the location of lines near homes. Anadarko's lack of knowledge regarding the location of its own lines would have precluded it from complying with the statute.

190.    Anadarko and the Commission reported on May 24, 2017 that a new methane cloud containing higher levels of methane than at the site of the Firestone Explosion had been discovered to the west of the Firestone Explosion site.

191.    *The Denver Post* reported on July 1, 2017 that the Company had pledged to permanently shut six wells in the neighborhood where the explosion occurred, and had plugged or capped over 6,000 lines in Colorado. Of the plugged lines, over 2,400 were abandoned flowlines,

which had been violating Rule 1103, which requires abandoned lines to be cut and sealed. The remaining 3,600 lines were 1" return lines[14] associated with vertical wells.

**The Mead Explosion**

192.    On May 25, 2017, an oil tank battery owned by Anadarko in Mead, Colorado—roughly four miles from the Firestone Explosion—exploded while contract workers were performing maintenance, killing one man and injuring three others.

193.    Anadarko's share price fell $1.33, or 2.5%, the following day, closing at $51.84 on May 26, 2017.

194.    Fire investigators announced on August 11, 2017 that the blast had been caused by a buildup of "combustible products" from the storage tanks. These substances had gathered in a trench dug by the workers and were ignited by their equipment. OSHA had not yet released results of its investigation into the blast as of the filing of this Complaint.

195.    Colorado oil and gas regulators tasked Anadarko with performing a "root cause" analysis to determine how and why the explosion occurred.

196.    The Board of Trustees of Erie, Colorado, which straddles Boulder and Weld Counties, voted in an amendment to their Municipal Code which required oil and gas operators to map lines within municipal limits by December 31, 2017. Lafayette, Colorado is considering following suit.

**False and Misleading Statements During the False Statements Relevant Period**

197.    As a result of the foregoing, and as described further below, certain of the Company's public statements were materially false and misleading during the False Statements Relevant Period. The Individual Defendants failed to correct and/or caused the Company to fail to

---

[14] Return lines are pipelines or flowlines that transport natural gas to power a separator near the well that separates the raw mixture of oil, natural gas, and water.

correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

**Wattenberg Integrated Operations Center Factsheet**

198. At all relevant times, the Company published on its website a Wattenberg Integrated Operations Center Factsheet (the "Operations Center Factsheet"). The Operations Center Factsheet states that the Operations Center "[p]rovides real-time remote-monitoring capabilities for 6,800+ wells and 3,700+ tank facilities", and that it further "[a]pplies state of the art oil, natural gas, and water management to Anadarko tank batteries, facilities and pipeline infrastructure." The Operations Center Factsheet claims that the Company "[i]mmediately pinpoints issues associated with field alerts and alarms."

199. In making these statements, the Operations Center Factsheet was affirmatively false and misleading since the Company: (1) possessed a large number of old and decaying facilities and pipelines; and (2) was unable to pinpoint issues or provide real-time monitoring consistently because it did not know where many of its lines were located.

**2016 Health, Safety & Environment ("HSE") Fact Sheet**

200. On or before February 8, 2016, Anadarko published on its website a 2016 HSE Fact Sheet, which stated that "our HSE team works seamlessly with operations and facilities to ensure compliance with all applicable laws and regulations." Further, the 2016 HSE Fact Sheet claimed that "[w]e work to ensure that all of our activities are conducted to meet or surpass all applicable health, safety and environmental (HSE) laws, regulations, and international standards."

201. The 2016 HSE Fact Sheet contained the Company's NYSE stock symbol, "APC," in the top margin. The document was available on Anadarko's website until it was replaced by the 2017 HSE Fact Sheet, discussed below, on or before February 23, 2017.

202.    In making these statements, the 2016 HSE Fact Sheet Operations Center Factsheet was affirmatively false and misleading since the Company: (1) knowingly and intentionally violated Colorado law and regulations in its operations, including Rule 1103; and (2) knew that hundreds of the wells it had acquired in the Land Swap did not comply with a variety of Colorado laws and regulations, including those violations leading to the Firestone Explosion.

**February 17, 2016 Form 10-K**

203.    On February 17, 2016, the Company filed with the SEC its annual report for the fiscal year ending December 31, 2015 on a Form 10-K (the "2015 10-K"), which was signed by Defendants Walker, Gwin, Chase, Eberhart, Fluor, Gorder, Gordon, Gourley, McKinley, and Mullins.

204.    The 2015 10-K affirmatively misrepresented to the investing public that "[t]he Company believes that it is in material compliance with the existing environmental and occupational health and safety regulations."  The 2015 10-K stated, in relevant part:

> Anadarko's business operations are subject to numerous international, provincial, federal, regional, state, tribal, local, and foreign environmental and occupational health and safety laws and regulations.
>
> ***
>
> The Company has incurred and will continue to incur operating and capital expenditures, some of which may be material, to comply with environmental and occupational health and safety laws and regulations. Although the Company is not fully insured against all environmental and occupational health and safety risks, and the Company's insurance does not cover any penalties or fines that may be issued by a governmental authority, it maintains insurance coverage that it believes is sufficient based on the Company's assessment of insurable risks and consistent with insurance coverage held by other similarly situated industry participants. Nevertheless, it is possible that other developments, such as stricter and more comprehensive environmental and occupational health and safety laws and regulations as well as claims for damages to property or persons resulting from the Company's operations, could result in substantial costs and liabilities, including administrative, civil, and criminal penalties, to Anadarko.
>
> ***The Company believes that it is in material compliance with existing environmental and occupational health and safety regulations.*** Further, the Company believes that the cost of maintaining compliance with these existing laws

and regulations will not have a material adverse effect on its business, financial condition, results of operations, or cash flows, but new or more stringently applied existing laws and regulations could increase the cost of doing business, and such increases could be material.

(Emphasis added.)

205.     Attached to the 2015 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) of the Securities Exchange Act of 1934, Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the SOX, signed by Defendants Walker and Gwin, attesting to the accuracy of the 2015 10-K.

206.     The 2015 10-K made false and/or misleading statements regarding the Company's compliance with environmental health and safety regulations, as well as omissions of material fact that failed to disclose that the Company: (1) engaged in the Health and Safety Misconduct; and (2) had not maintained adequate internal controls. As a result of the foregoing, the Company's 2015 10-K was materially false and misleading.

**The 2015 Safety Report**

207.     Anadarko published on its website its Health, Safety, Environment and Sustainability Overview 2015 (the "2015 Safety Report") on or before March 12, 2016. The 2015 Safety Report was signed by Defendant Walker and was available on Anadarko's website until publication of the 2016 Safety Report (as defined herein).

208.     The 2015 Safety Report represented that Anadarko operated in compliance with the law, specifically stating:

Oil and natural gas upstream and midstream operations are subject to laws and regulations in every country in which Anadarko operates. Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations.

209.     The Report further indicated that its teams were oriented to bringing spill incidents down to zero though equipment design, operation, and staff training. Specifically:

Anadarko is committed to preventing and minimizing the impacts of spills at all operations. This commitment is demonstrated by the implementation of best management practices, engineering design, mechanical integrity, product assessment and training. Anadarko promotes a culture that allows for employee involvement in maintaining a safe work environment while recognizing that environmental incidents are preventable. **The teams strive for ZERO incidents. Spills can be prevented by designing and operating equipment and training staff to avoid releases.**

(Emphasis added.)

210.    In making these statements, the 2015 Safety Report was affirmatively false and misleading since the Company: (1) knowingly and intentionally violated Colorado law and regulations in its operations, including Rule 1103; (2) knew that hundreds of the wells it had acquired in the Land Swap did not comply with a variety of Colorado laws and regulations, including those violations leading to the Firestone Explosion; (3) was aware that it had insufficient skilled employees to meet its goal of zero incidents; and (4) pursued a strategy of allowing spills to occur where costs of clean up were projected to be less than costs of remediation.

### The 2016 Proxy Statement

211.    The Company's Schedule 14A filed with the SEC on March 18, 2016 (the "2016 Proxy Statement"), states that the Company's "Corporate Governance Guidelines, By-Laws, Code of Business Conduct and Ethics, Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer, and written charters for the Audit Committee, the Compensation Committee, and the Governance and Risk Committee, all as amended from time to time, can be found on the Company's website . . . These documents provide the framework for our corporate governance."

212.    The 2016 Proxy statement was false and misleading because, despite assertions to the contrary, its Code of Business Conduct and Ethics was not followed, resulting in—and evidenced by—the Firestone Explosion and the Mead Explosion.

213.    The Individual Defendants also caused the 2016 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were based on unsound maintenance and safety protocols and therefore any compensation based on the Company's financial performance was artificially inflated.

214.    The 2016 Proxy Statement also failed to disclose that the Company: (1) engaged in the Health and Safety Misconduct; and (2) had not maintained adequate internal controls.

**<u>2016 Form 10-Q's</u>**

215.    The Company filed with the SEC a 10-Q for the quarter ending March 31, 2016 on May 2, 2016 (the "2016 Q1 10-Q"), which reported a net loss of $1.03 billion on revenue of $1.77 billion, representing a loss of $2.03 per diluted share.

216.    Attached to the 2016 Q1 10-Q were SOX certifications signed by Defendants Walker and Gwin, attesting to the accuracy of the 2016 Q1 10-Q.

217.    The 2016 Q1 10-Q made omissions of material fact that failed to disclose that the Company: (1) engaged in the Health and Safety Misconduct; and (2) had not maintained adequate internal controls. As a result of the foregoing, the Company's 2016 Q1 10-Q was materially false and misleading.

218.    The Company filed with the SEC a 10-Q for the quarter ending June 30, 2016 on July 26, 2016 (the "2016 Q2 10-Q"), which reported a net loss of $692 million on revenue of $1.97 billion, representing a loss of $0.12 per diluted share.

219.    Attached to the 2016 Q2 10-Q were SOX certifications signed by Defendants Walker and Gwin, attesting to the accuracy of the 2016 Q2 10-Q.

220.    The 2016 Q2 10-Q made omissions of material fact that failed to disclose that the Company: (1) engaged in the Health and Safety Misconduct; and (2) had not maintained adequate internal controls. As a result of the foregoing, the Company's 2016 Q2 10-Q was materially false and misleading.

221.    The Company filed a 10-Q for the quarter ending September 30, 2016 on October 31, 2016 (the "2016 Q3 10-Q"), which reported a net loss of $830 million on revenue of $1.95 billion, representing a loss of $1.61 per diluted share.

222.    Attached to the 2016 Q3 10-Q were SOX certifications signed by Defendants Walker and Gwin, attesting to the accuracy of the 2016 Q3 10-Q.

223.    The 2016 Q3 10-Q made omissions of material fact that failed to disclose that the Company: (1) engaged in the Health and Safety Misconduct; and (2) had not maintained adequate internal controls. As a result of the foregoing, the Company's 2016 Q3 10-Q was materially false and misleading.

**Registration Statement**

224.    Anadarko filed a Registration Statement on Form S-3 with the SEC on August 12, 2016 (the "Registration Statement"), incorporating by reference the 2015 10-K, and on September 12, 2016, Anadarko sold 40,537,500 shares at $54.50, raising $2.2 billion. This represented the largest stock offering in Anadarko's history by dollar amount.

225.    As the Registration Statement incorporated the 2015 10-K by reference, the Registration Statement made the same false and/or misleading statements regarding the Company's compliance with environmental health and safety regulations, as well as omissions of material fact that failed to disclose that the Company: (1) engaged in the Health and Safety

Misconduct; and (2) had not maintained adequate internal controls. As a result of the foregoing, the Company's Registration Statement was materially false and misleading.

### February 17, 2017 Form 10-K

226.    On February 17, 2017, the Company filed with the SEC its annual report for fiscal year ending December 31, 2016, on a Form 10-K (the "2016 10-K"), which was signed by Defendants Walker, Gwin, Chase, Constable, Eberhart, Farley, Fluor, Gorder, Gordon, Gourley, McKinley, and Mullins. For Q4 2016, the Company reported a $515 million net loss on revenue of $2.42 billion, representing a loss of $0.94 per diluted share. The Company reported a net loss of $3.07 billion on revenue of $8.13 billion for fiscal year 2016, representing a loss of $5.90 per diluted share.

227.    Attached to the 2016 10-K were SOX certifications signed by Defendants Walker and Gwin, attesting to the accuracy of the 2016 10-K.

228.    The 2016 10-K made omissions of material fact that failed to disclose that the Company: (1) engaged in the Health and Safety Misconduct; and (2) had not maintained adequate internal controls. As a result of the foregoing, the Company's 2016 10-K was materially false and misleading.

### The 2017 HSE Fact Sheet

229.    Anadarko published its Health, Safety and Environment/Corporate Sustainability Report Fact Sheet (the "2017 HSE Fact Sheet") on its website on or before February 23, 2017. That document, which displayed Anadarko's stock ticker in the top margin, stated that "[w]e work to ensure that all of our activities are conducted to meet or exceed applicable laws, regulations and international standards."

230.    In making these statements, the 2017 HSE Fact Sheet Operations Center Factsheet was affirmatively false and misleading since the Company:  (1) knowingly and intentionally violated Colorado law and regulations in its operations, including Rule 1103; and (2) knew that hundreds of the wells it had acquired in the Land Swap did not comply with a variety of Colorado laws and regulations, including those violations leading to the Firestone Explosion.

**The 2016 Safety Report**

231.    Anadarko published its Health, safety, Environment and Sustainability Overview 2016 (the "2016 Safety Report") on its website on or before March 3, 2017, which was signed by Defendant Walker, and remains available on the Company's website as of the filing of this Complaint.

232.    The 2016 Safety Report represented that Anadarko operated in compliance with the law, specifically stating:

> Oil and natural gas upstream and midstream operations are subject to laws and regulations in every country in which Anadarko operates. Anadarko operates its global onshore and offshore operations in compliance with the applicable laws and associated regulations.

233.    The Report further indicated that its teams were oriented to bringing spill incidents down to zero though equipment design, operation, and staff training. Specifically:

> Anadarko is committed to preventing and minimizing the impacts of spills everywhere it operates. This commitment is demonstrated by the implementation of best management practices, engineering design, mechanical integrity, product assessment and training. We promote a culture that enables employee involvement in maintaining a safe work environment while recognizing that environmental incidents are preventable. **The teams strive for ZERO incidents. Spills can be prevented by designing and operating equipment and training staff to avoid releases.**

(Emphasis added.)

234.    In making these statements, the 2016 Safety Report was affirmatively false and misleading since the Company: (1) knowingly and intentionally violated Colorado law and regulations in its operations, including Rule 1103; (2) knew that hundreds of the wells it had acquired in the Land Swap did not comply with a variety of Colorado laws and regulations, including those violations leading to the Firestone Explosion; (3) was aware that it had insufficient skilled employees to meet its goal of zero incidents; and (4) pursued a strategy of allowing spills to occur where costs of clean up were projected to be less than costs of remediation.

**The 2017 Proxy Statement**

235.    The Company's 2017 Proxy Statement, which was filed with the SEC on March 17, 2017, states that Anadarko's "Corporate Governance Guidelines, By-Laws, Code of Business Conduct and Ethics, Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer, and written charters for the Audit Committee, the Compensation and Benefits Committee (Compensation Committee), and the Governance and Risk Committee, all as amended from time to time, can be found on the Company's website . . . These documents provide the framework for our corporate governance."

236.    The 2017 Proxy statement was false and misleading because, despite assertions to the contrary, its Code of Business Conduct and Ethics was not followed, resulting in—and evidenced by—the Firestone Explosion.

237.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were based on unsound maintenance and safety protocols and therefore any compensation based on the Company's financial performance was artificially inflated.

238.    The 2017 Proxy Statement also failed to disclose that the Company: (1) engaged in the Health and Safety Misconduct; and (2) had not maintained adequate internal controls.

**The Truth Emerges**

239.    On April 17, 2016, due to odorless natural gas escaping from a severed flowline leading from the Firestone Well and saturating the ground, a home which was located within 200 feet of the well exploded, killing Mark Martinez and Joseph Irwin III as they attempted to install a water heater. Erin Martinez, Mr. Martinez's wife was critically injured. The Martinez's 11-year old son narrowly escaped serious injury by jumping out of his bedroom window. Ms. Martinez remained in the hospital for a month and a half.

240.    According to an April 26, 2017 report by *The Denver Post* published after markets closed, following the explosion, Anadarko voluntarily shut down 3,000 vertical wells in the area. According to Company estimates as announced on April 26, 2017, these closures cut production by 13,000 net barrels of oil per day—representing approximately 1.6% of Anadarko's average daily production.

241.    The Company's share price dropped 4.73%, or $2.84, the following day, closing at $57.12 on April 27, 2017.

242.    On May 2, 2017 after the close of trading, findings from an investigation conducted by state and local entities were announced, which concluded that the explosion was linked to a severed 1" flowline from the Firestone Well that had been abandoned but not been disconnected or capped. Failure to disconnect and cap the line is a violation of Rule 1103.

243.    Following the announcement of the investigators' conclusions, Anadarko's share price fell $4.33, or 7.7%, from the previous day's price, closing at $51.95 on May 3, 2017.

244. On May 2, 2017, Anardarko published a statement attributed to Defendant Walker that read: "Our thoughts and prayers remain with the Martinez and Irwin families as they continue to mourn the loss of their loved ones," adding that "[t]he safety of our employees and the people who live and work in the communities in which we operate is our number one priority."

245. A May 10, 2017 article in *The Denver Post* reported that the National Transportation Safety Board had joined the local investigation into the Firestone Explosion. Further, the article noted that a National Transportation Safety Board spokesman had indicated that it was looking to see whether there were safety issues that could have a national policy impact.

246. On May 17, 2017, *The International Business Times* reported that Anadarko had successfully lobbied against proposed Colorado legislation that sought to require operators to disclose the location of lines near homes. Anadarko's lack of knowledge regarding the location of its own lines would have precluded it from complying with the statute.

247. On May 24, 2017, Anadarko and the Commission reported that a new methane cloud containing higher levels of methane than at the site of the Firestone Explosion had been discovered to the west of the Firestone Explosion site.

248. On May 25, 2017, an oil tank battery owned by Anadarko in Mead, Colorado— roughly four miles from the Firestone Explosion—exploded while contract workers were performing maintenance, killing one man and injuring three others.

249. Anadarko's share price fell $1.33, or 2.5%, the following day, closing at $51.84 on May 26, 2017.

250. On July 1, 2017, *The Denver Post* reported that the Company had pledged to permanently shut six wells in the neighborhood where the explosion occurred, and had plugged or capped over 6,000 lines in Colorado. Of the plugged lines, over 2,400 were abandoned flowlines,

which had been violating Rule 1103, which requires abandoned lines to be cut and sealed. The remaining 3,600 lines were 1" return lines[15] associated with vertical wells.

251.    On August 11, 2017, fire investigators announced that the blast had been caused by a buildup of "combustible products" from the storage tanks. These substances had gathered in a trench dug by the workers and were ignited by their equipment. OSHA had not yet released results of its investigation into the blast as of the filing of this Complaint.

252.    Colorado oil and gas regulators tasked Anadarko with performing a "root cause" analysis to determine how and why the explosion occurred.

253.    By the close of trading on August 30, 2017, the price per share of Company stock fell to $40.52.

## Repurchases During the False Statements Relevant Period

254.    During the period in which the Company made false and or misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.[16]

255.    According to the 2016 Q2 10-Q, during the three months ended June 30, 2016, the Individual Defendants caused the Company to repurchase 18,445 shares of its own common stock at an average price per share of approximately $51.01, for a total cost to the Company of $940,879.

256.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $10.49 more than the actual worth of each share during the three months ended

---

[15] Return lines are pipelines or flowlines that transport natural gas to power a separator near the well that separates the raw mixture of oil, natural gas, and water.

[16] The amounts of stock repurchased and referenced in this subsection include shares related to stock received by the Company for payment of withholding taxes due on employee share issuances under share-based compensation plans.

June 30, 2016. Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended June 30, 2016 was approximately $193,488.

257.     According to the 2016 Q3 10-Q, during the three months ended September 30, 2016 the Individual Defendants caused the Company to repurchase 28,932 shares of its own common stock at an average price per share of approximately $54.41, for a total cost to the Company of approximately $1.6 million.

258.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $13.89 more than the actual worth of each share during the three months ended September 30, 2016. Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended September 30, 2016 was approximately $401,865.

259.     According to the 2016 10-K, during the three months ended December 31, 2016 the Individual Defendants caused the Company to repurchase 88,923 shares of its own common stock at an average price per share of approximately $61.46, for a total cost to the Company of approximately $5.5 million.

260.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $20.94 more than the actual worth of each share during the three months ended December 31, 2016. Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended December 31, 2016 was nearly $1.9 million.

261.     According to the Company's Form 10-Q filed with the SEC on May 2, 2017, during the three months ended March 31, 2017, the Individual Defendants caused the Company to

repurchase 331,383 shares of its own common stock at an average price per share of approximately $63.13, for a total cost to the Company of $20.9 million.

262.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $22.61 more than the actual worth of each share during the three months ended March 31, 2017. Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended March 31, 2017 was approximately $7.5 million.

263.    According to the Company's Form 10-Q filed with the SEC on July 24, 2017, during the three months ended June 2017, the Individual Defendants caused the Company to repurchase 255,496 shares of its own common stock at an average price per share of approximately $61.55, for a total cost to the Company of approximately $15.7 million.

264.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $21.03 more than the actual worth of each share during the three months ended June 2017. Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended June 2017 was nearly 5.4 million.

265.    In total, the Company overpaid an aggregate amount of over $15.3 million for repurchases of its own stock during the period the Company made false and misleading statements and omissions.

## DAMAGES TO ANADARKO

266.    As a direct and proximate result of the Individual Defendants' conduct, Anadarko will lose and expend many millions of dollars.

267.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

268.    Such costs include, but are not limited to, those incurred related to the investigations and analyses arising from the Health and Safety Misconduct, including the ongoing OSHA investigation of the Mead Explosion.

269.    Such losses include, but are not limited to, over $15.3 million that the Company overpaid, at the direction of the Individual Defendants, for its repurchases of its own stock at artificially inflated prices.

270.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

271.    As a direct and proximate result of the Individual Defendants' conduct, Anadarko has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

272.    Plaintiff brings this action derivatively and for the benefit of Anadarko to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Anadarko, gross mismanagement, abuse of control,

waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

273.    Anadarko is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

274.    Plaintiff is, and has been continuously been since before the beginning of the General Relevant Period, a shareholder of Anadarko. Plaintiff will adequately and fairly represent the interests of Anadarko in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

275.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

276.    A pre-suit demand on the Board of Anadarko is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eleven individuals: Individual Defendants Chase, Constable, Eberhart, Farley, Fluor, Gorder, Gordon, Gourley, McKinley, Mullins and Walker (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven directors who were on the Board at the time this action was commenced.

277.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to engage in the Health and Safety Misconduct, and to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

278.     Demand is also excused as to all of the Directors because the unlawful business strategy that the Company engaged in was not a valid exercise of business judgment. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

279.     In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the conduct alleged herein. The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

280.     Additional reasons that demand on Defendant Walker is futile follow. Defendant Walker was the Company's President and CEO at all relevant times, and is thus, as the Company admits, a non-independent director. Defendant Walker is also the Chair of the Executive Committee. Indeed, Defendant Walker receives millions of dollars in compensation from the Company annually. For example, Defendant Walker received total compensation of $18,650,252 for 2016. Defendant Walker was ultimately responsible for all of the misconduct alleged herein, including the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings. His large Company stock holding, worth approximately $62 million before the Health and Safety Misconduct was exposed, reveals his interest in keeping the Company's stock price as high as possible. Moreover, Defendant Walker is a defendant in the Securities Class Action. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Health and Safety Misconduct and scheme to make false and misleading statements and/or omissions of material fact consciously disregarded his duties to monitor such controls over reporting and engagement in the

schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Walker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

281.    Additional reasons that demand on Defendant Chase is futile follow. Defendant Chase has served as a Company director since February 2014. Defendant Chase is also a member of the Governance and Risk Committee. He received lavish compensation, including $361,845 in 2016. Moreover, Defendant Chase's large Company stock holding, worth approximately $1.1 million before the Health and Safety Misconduct was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, Defendant Chase conducted little, if any, oversight of the Company's engagement in the Health and Safety Misconduct and scheme to make false and misleading statements and/or omissions of material fact consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed both the 2015 10-K and the 2016 10-K. For these reasons, too, Defendant Chase breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

282.    Additional reasons that demand on Defendant Constable is futile follow. Defendant Constable has served as a Company director since July 2016. Defendant Constable is also a member of the Audit Committee. He received lavish compensation, including $213,076 in 2016. Moreover, Defendant Constable's large Company stock holding, worth approximately $304,352 before the Health and Safety Misconduct was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, Defendant Constable

conducted little, if any, oversight of the Company's engagement in the Health and Safety Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K. For these reasons, too, Defendant Constable breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

283.    Additional reasons that demand on Defendant Eberhart is futile follow. Defendant Eberthart has served as a Company director since August 2004, and as Lead Director since February 2016. Defendant Eberhart also serves as Chair of the Governance and Risk Committee and member of the Executive Committee. She received lavish compensation, including $418,043 in 2016. Moreover, Defendant Eberhart's large Company stock holding, worth approximately $32.7 million before the Health and Safety Misconduct was exposed, reveals her interest in keeping the Company's stock price as high as possible. As a trusted Company director, Chair of the Governance and Risk Committee, and member of the Executive Committee, Defendant Eberhart conducted little, if any, oversight of the Company's engagement in the Health and Safety Misconduct and scheme to make false and misleading statements and/or omissions of material fact consciously disregarded her duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, she was the was the maker of many of the false statements and omissions of material fact that are alleged herein, as she signed both the 2015 10-K and the 2016 10-K. For these reasons, too, Defendant Eberhart breached her

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

284.    Additional reasons that demand on Defendant Farley is futile follow. Defendant Farley has served as a Company director since February 2017. Moreover, Defendant Farley's large Company stock holding, worth approximately $67,208 before the Health and Safety Misconduct was exposed, reveals her interest in keeping the Company's stock price as high as possible. As a trusted Company director and member of the Audit Committee, Defendant Farley conducted little, if any, oversight of the Company's engagement in the Health and Safety Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded her duties to monitor engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2016 10-K.  For these reasons, too, Defendant Farley breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

285.    Additional reasons that demand on Defendant Fluor is futile follow. Defendant Flour has served as a Company director since August 2007. He received lavish compensation, including $370,714 in 2016. Moreover, Defendant Fluor's large Company stock holding, worth approximately $9.1 million before the Health and Safety Misconduct was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, and a member of the Compensation and Benefits Committee, Defendant Fluor conducted little, if any, oversight of the Company's engagement in the Health and Safety Misconduct and scheme to make false and misleading statements and/or omissions of material fact\consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect

corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed both the 2015 10-K and the 2016 10-K. For these reasons, too, Defendant Fluor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

286.   Additional reasons that demand on Defendant Gorder is futile follow. Defendant Gorder has served as a Company director since July 2014. He received lavish compensation, including $377,900 in 2016. Moreover, Defendant Gorder's large Company stock holding, worth approximately $892,524 before the Health and Safety Misconduct was exposed, reveals his interest in keeping the Company's stock price as high as possible. As the Company's trusted director, Chair of the Compensation and Benefits Committee and member of the Executive Committee, Defendant Gorder conducted little, if any, oversight of the Company's engagement in the Health and Safety Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed both the 2015 10-K and the 2016 10-K. For these reasons, too, Defendant Gorder breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

287.   Additional reasons that demand on Defendant Gordon is futile follow. Defendant Gordon has served as a Company director since April 1988. He received lavish compensation, including $365,599 in 2016. Moreover, Defendant Gordon's large Company stock holding, worth approximately $11.9 million before the Health and Safety Misconduct was exposed, reveals his

Verified Shareholder Derivative Complaint

interest in keeping the Company's stock price as high as possible. As a trusted Company director, and member of the Compensation and Benefits Committee, Defendant Gordon conducted little, if any, oversight of the Company's engagement in the Health and Safety Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed both the 2015 10-K and the 2016 10-K. For these reasons, too, Defendant Gordon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

288.     Additional reasons that demand on Defendant Gourley is futile follow. Defendant Gourley has served as a Company director since September 2015. He received lavish compensation, including $361,836 in 2016. Moreover, Defendant Gourley's large Company stock holding, worth approximately $573,912 before the Health and Safety Misconduct was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director and member of the Governance and Risk Committee, Defendant Gourley conducted little, if any, oversight of the Company's engagement in the Health and Safety Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed both the 2015 10-K and the 2016 10-K. For these reasons, too, Defendant Gourley breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

289.    Additional reasons that demand on Defendant McKinley is futile follow. Defendant McKinley has served as a Company director since February 2015. He received lavish compensation, including $361,836 in 2016. Moreover, Defendant McKinley's large Company stock holding, worth approximately $706,414 before the Health and Safety Misconduct was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director and member of the Audit Committee Defendant McKinley conducted little, if any, oversight of the Company's engagement in the Health and Safety Misconduct and scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed both the 2015 10-K and the 2016 10-K. For these reasons, too, Defendant McKinley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

290.    Additional reasons that demand on Defendant Mullins is futile follow. Defendant Mullins has served as a Company director since May 2012. He received lavish compensation, including $386,823 in 2016. Moreover, Defendant Mullins' large Company stock holding, worth approximately $706,414 before the Health and Safety Misconduct was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a trusted Company director, Chair of the Audit Committee and member of the Executive Committee, Defendant Mullins conducted little, if any, oversight of the Company's engagement in the Health and Safety Misconduct and

scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed both the 2015 10-K and the 2016 10-K. For these reasons, too, Defendant Mullins breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

291.    Additional reasons that demand on the Board is futile follow.

292.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, and one of whom is a defendant in the Securities Class Action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

293.    Additionally, demand is excused as to Defendants Eberhart, Chase, and Gourley (the "Governance and Risk Committee Directors") due to their failure to uphold the Governance and Risk Charter as members of the Governance and Risk Committee. The Governance and Risk Committee Directors, pursuant to Anadarko's Governance and Risk Committee Charter, were responsible for periodically reviewing and discussing with management the status of the Company's environmental, health and safety ("EHS") programs, policies and procedures.

294. Additionally, each one of the Directors, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $15.3 million for its own common stock during the period in which the false and misleading statements were made. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

295. Anadarko has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Anadarko any part of the damages Anadarko suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

296. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

297. The acts complained of herein constitute violations of fiduciary duties owed by Anadarko's officers and directors, and these acts are incapable of ratification.

298.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Anadarko. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Anadarko, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

299.    If there is no directors' and officers' liability insurance, then the Directors will not cause Anadarko to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

300.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

301.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

302.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

303.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

304.     Under the direction and watch of the Directors, the 2016 and 2017 Proxy Statements failed to disclose that the Company: (1) engaged in the Health and Safety Misconduct; and (2) had not maintained adequate internal controls.

305.     The Individual Defendants also caused the 2016 and 2017 Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were based on unsound maintenance and safety protocols and therefore any compensation based on the Company's financial performance was artificially inflated.

306.     The 2016 and 2017 Proxy Statements also made reference to the Company's Code of Business Conduct and Ethics. The Code required the Company and Individual Defendants to

abide by relevant laws and statutes, in addition to "tak[ing] necessary precautions to prevent accidents or injuries, as well as to report any unsafe practices or conditions." By engaging in the Health and Safety Misconduct the Individual Defendants violated the Code of Conduct. The 2016 and 2017 Proxy Statements failed to disclose these violations and also failed to disclose that the terms of the Code of Business Conduct and Ethics were being violated.

307.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2016 and 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2016 and 2017 Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

308.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 and 2017 Proxy Statements.

## SECOND CLAIM

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

309.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

310.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Anadarko. Not only is Anadarko now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Anadarko by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices

due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase tens of millions of dollars of its own shares on the open market at artificially-inflated prices, damaging Anadarko by millions of dollars.

311. During the False Statements Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

312. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Anadarko not misleading.

313. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Anadarko. The Individual Defendants acted with scienter during the General Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and

for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

314.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director would have signed the Company's false and misleading Form 10-K's filed with the SEC during the False Statements Relevant Period, including Defendants Walker, Gwin, Chase, Eberhart, Fluor, Gorder, Gordon, Gourley, McKinley, and Mullins, who signed the 2015 10-K, and Defendants Walker, Gwin, Chase, Constable, Eberhart, Farley, Fluor, Gorder, Gordon, Gourley, McKinley, and Mullins, who signed the 2016 10-K.

315.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

316.    Plaintiff on behalf of Anadarko has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

317.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

318.    The Individual Defendants, by virtue of their positions with Anadarko and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Anadarko within the meaning of §20 (a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Anadarko to engage in the illegal conduct and practices complained of herein.

## FOURTH CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

319.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

320.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Anadarko's business and affairs.

321.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

322.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Anadarko.

323.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

324.    In further breach of their fiduciary duties owed to Anadarko, the Individual Defendants willfully or recklessly caused the Company to engage in the Health and Safety Misconduct.

325.    Also in breach of their fiduciary duties owed to Anadarko, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that the Company: (1) engaged in the Health and Safety Misconduct; and (2) had not maintained adequate internal controls. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions

of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

326.     In further breach of their fiduciary duties owed to Anadarko, the Individual Defendants willfully or recklessly caused the Company to repurchase nearly $44.6 million worth of Company stock at artificially inflated prices.

327.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Anadarko's securities.

328.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Anadarko's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

329.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

330.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Anadarko has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

331.    Plaintiff on behalf of Anadarko has no adequate remedy at law.

### FIFTH CLAIM

**Against Individual Defendants for Unjust Enrichment**

332.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

333.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Anadarko.

334.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Anadarko that was tied to the performance or artificially inflated valuation of Anadarko, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

335.    Plaintiff, as a shareholder and a representative of Anadarko, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

336.    Plaintiff on behalf of Anadarko has no adequate remedy at law.

Verified Shareholder Derivative Complaint

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

337.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

338.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Anadarko, for which they are legally responsible.

339.    As a direct and proximate result of the Individual Defendants' abuse of control, Anadarko has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Anadarko has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

340.    Plaintiff on behalf of Anadarko has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

341.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

342.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Anadarko in a manner consistent with the operations of a publicly-held corporation.

343.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Anadarko has sustained and will continue to sustain significant damages.

344.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

345.    Plaintiff, on behalf of Anadarko, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

346.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

347.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

348.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

349.    Plaintiff on behalf of Anadarko has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Anadarko, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Anadarko;

(c)    Determining and awarding to Anadarko the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Anadarko and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Anadarko and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Anadarko to nominate at least six candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Anadarko restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

Dated: October 18, 2017                    Respectfully submitted,


/s/ Willie C. Briscoe
Willie C. Briscoe
Texas Bar No.: 24001788
Southern District No.: 25157
**THE BRISCOE LAW FIRM, PLLC**

3131 McKinney Avenue, Suite 600
Dallas, Texas 75204
214-643-6011
281-254-7789 (Facsimile)
wbriscoe@thebriscoelawfirm.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint